The court calls the case of Mr. Corey Maples v. the Commissioner of the Alabama Department of Corrections for the appellant. Is it Mr. Carr? Yes, Your Honor. You may proceed. Thank you, Your Honor, and may it please the court. While the evidence that Corey Maples committed the shootings in this case may have been overwhelming, the case that Corey Maples should be sentenced to death for those shootings, as opposed to spend the rest of his life in jail, has always been exceedingly close. The state itself rested its case for capital punishment on the basis of a single aggravating factor. The state itself conceded that Mr. Maples, unlike many if not most capital defendants, had no prior history of violence. And even with the appallingly deficient representation that Mr. Maples received at a penalty phase of his trial, the jury still only recommended a death sentence by the slimmest margin allowed under Alabama law, a 10-2 vote. This underscores that a constitutionally adequate defense could have made the difference between life and death in this case. Yet the superficial case that Mr. Maples' counsel slapped together literally at the last minute before his penalty phase not only lacked the description, depth, and details that this court has repeatedly recognized are necessary to presenting a compelling case to the jury, but was affirmatively misleading in critical respects and omitted key parts of Mr. Maples' life history altogether. The district court's conclusion and the state court's conclusion that Mr. Maples nevertheless received effective assistance of counsel and was not prejudiced by that deficient performance is contrary to clearly established precedent of the Supreme Court and this court. And maybe the most basic way in which to see that is the court's utter failure to reweigh the totality of the mitigation evidence that could have been presented at the penalty phase of Mr. Maples' trial against the sole aggravating factor that the state relied upon in seeking death. And I think you can see this in particular pages 118, 141, and 147 of the district court's prejudice. Would it, for the procedural default, be the same evidence to establish Strickland prejudice? It would be, Your Honor. This court has held that. I believe we have, we cite the case on page four of our reply brief where this court has acknowledged that prejudice for purposes of establishing Strickland violation and prejudice for purposes of establishing a cause and prejudice for a cause are the same. Now, the state has argued that there's an additional bar that Mr. Maples has to meet that's inconsistent with this court's precedence. And in any event, they've. So we're, so we're pretty much limited to the allegations in the petition, right? Since there hasn't been an evidentiary hearing at any stage, right? That's correct, Your Honor. So when we go to the petition, point out to me or describe the evidence that would establish prejudice that's not cumulative of what the jury heard during the penalty phase. Sure. The jury. Because that's their strongest argument, is that the evidence is cumulative. Yes, Your Honor. The sum in total of the evidence of abuse that the jury heard was about two and a half, at most three pages, of conclusory allegations presented by the jury. And that's at pages 3194 to 3196 of the record from the sentencing proceeding. And that's in volume seven of the appendix before this court. Now, let me tell you the evidence that the jury never heard, ever. And this comes straight from the amended petition in this case. The jury never heard about the time Corey's mother picked him up by the neck and nearly strangled him. That's at paragraph 118 of our amended petition. The jury never heard about the time his three years old. That was at paragraph 118 of the amended petition. They never heard about the fact that his grandparents were so afraid that his mom would kill him that they suggested he be taken out of his mom's custody. That's at page paragraph 118. They never heard about the fact that his mom was so unpredictable and violent that once she attacked Mr. Maples with a butcher knife, paragraph 118. They never heard that Corey Maples cried for his mother and had nightmares into his teenage years. That's at paragraph 122. They never heard that Corey Maples' mom abandoned Corey a second time at the age of when he was 17 years old, leaving all of his belongings on her front steps. That's on paragraphs 110 and 122. And they never heard the testimony of the family members and friends who could have spoken in detail about the abuse that Mr. Maples suffered and the well into his teenage years and right up to the times of the shooting. And this is one of the ways in which the deficient case. Did they ever hear that he tried to slit his wrists with a butcher knife? Your Honor, they did not. And that's critical because the jury didn't hear that Mr. Maples committed, tried to commit suicide, not just once, but three times. He tried to slit his wrists with a butcher knife. He tried to take 30 sleeping pills, pills. He tried a Russian roulette. And that is critical evidence, as this court recognized in the Williams v. Allen case, Your Honor. And what's most important about that evidence here is it links together with the evidence of his troubled childhood and abuse, showing that he was affected by that well into his teenage years and up to the point of time of the shootings. Because what I'm trying to figure out is whether or not that evidence is sufficient to establish a reasonable probability that the results of the proceeding would have been different. And what's your best argument? Because I think that's, I mean, we haven't previously conferred about this. But from my perspective, I think that's a close, that's a close. Your Honor, I would agree. I think the suicide, the fact that the jury never heard that he tried to commit suicide with a butcher knife and other means is itself a sufficient basis. That's because that type of evidence, as the Supreme Court and this court has recognized, is itself generally compelling. But here it's critical because it links together with the abuse that he suffers and shows that this was something that impacted him throughout his life and corrects. Did he ever tell his lawyer about that? He did. No evidence that he told his lawyer about the suicide attempt? There was, Your Honor. Or Dr. Sheehy, the psychologist who evaluated him? He didn't, Your Honor. He was asked the, well, not that he didn't tell them. He certainly knew about it, obviously, because he did. No, Your Honor. This is the basis of a complete failure of investigation. The counsel's investigation consisted of one meeting with the parents where they gave them. I'm talking about what the defendant himself knew. Did he ever tell the psychiatrist? I mean, excuse me, it was a psychologist. He never told Dr. Sheehy about the suicide attempts. Your Honor, I don't know the answer to that specifically. I couldn't find Dr. Sheehy's report in the record. I could only find his testimony. Do you know if his full report is in the record? I don't believe it's in the record before this court. I believe it's in the record. We could try to find that. Is it in the record in the state court? I believe so, Your Honor. Okay. I'm not certain about that. All right. But what I would say is even in instances where the counsel has misled his lawyer, where the defendant has misled his lawyer, sent them down the wrong track, there's still a duty to investigate. Would we be able to find answers to these questions if there was an evidentiary hearing? Absolutely, Your Honor. And for purposes of this case today, the court has to accept the allegations in the amended petition as court recognized in the Daniel case. And the allegations about the suicide are from paragraphs 130 and 131A of the amended complaint. And again, getting back to why this is so critical, the jury was led to believe falsely that the abuse that Mr. Maple suffered lasted until he was three and didn't affect him throughout his life. The counsel efforts to prepare the few family witnesses that they put on consisted of telling them at the lunch break between the guilt phase and the penalty phase that they were going to go on. That was the first time they learned about that. That's at paragraph 115 of the amended petition. And one of the things that they falsely elicited was a statement by Mr. Cory Maple's uncle that his life was pretty much okay. That's on page 3190 of the sentencing phase record, which is in volume seven of the appendix before this court, which was absolutely false and is contradicted by evidence in the record and set forth in the allegations and particularly the evidence of the suicide attempts. The allegations that he had, he had maintained long-term friendships. Did the jury hear that? Long-term? Long-term friendships or people who had known him for a long period of time over his life, as I understand it. No, Your Honor. I mean, the investigation here, again, consisted of a meeting with his parents who gave him the names of several people to go after. It lacked the complete indicia of a constitutionally adequate investigation. They didn't request any records from the police department where Mr. Maples engaged in assisting the police to apprehend a drug dealer. They didn't request mental health records. They didn't request education records. All of the things that are standard practice under the ABA procedures for capital cases. They didn't interview a single witness about the penalty phase. Let me ask you about the allegations about head trauma. I didn't see any allegations about the significance of that or how that might have affected Mr. Maples later in his life. Were there such allegations? Your Honor, the allegations on that are paragraphs 123 to 150, and I think you're right that they are not explored beyond the impact of those head traumas and the fact that counsel never requested any hospital records as to those head injuries, never engaged an expert who could actually evaluate head trauma like that. Now, he was examined by a psychologist, but when you hit your head from a 20-foot fall from a cliff, you don't go to see a psychologist. You go to see a medical doctor who can evaluate that head trauma. That was back when he was a teenager. The fall from the cliff was four or five years before the murders, I think. That's right, Your Honor, but what I was... After that, he also got his GED, correct? Yes, but he also suffered another hit on his head with a baseball bat a year before the shootings. Going back to the amended complaint, there's no allegation of brain damage or any damage from blasting damage or any connection to damage from the two falls. Well, I would disagree with that, Your Honor. I think the fair reading, and I think we'd be entitled to the favorable inferences at this stage on the pleadings themselves that have to be accepted as true of paragraphs 123 and 150 is that he did suffer injury and head trauma from that. He was never evaluated for... It looked to me like prior counsel, or perhaps you did it, did hire a neuropsychologist to develop evidence in the post-conviction proceedings. I saw there was funds for a neuropsychologist. Is that correct? Was that you or was that... I believe that's true. It was not me, Your Honor. It was Solomon, the prior counsel. And I have not seen... Because that's why, following up on Judge Pryor's question, there were and the state makes a lot of the fact that you didn't then have any allegations in the amended petition or even in the federal petition tying up the so-called head trauma. That's what a neuropsych... Sure. You agree with me. A neuropsychologist is hired to try to evaluate... I believe that's correct, yes. All right. And so then nobody made any allegations in the amended Rule 32 or in the federal petition about there being brain damage or what type of psychological impact from the two head trauma. Well, I would say... Is that correct? We never got anything in the record from the neuropsychologist? That is correct, Your Honor. And no allegations. You don't have to prove it. You just have to allege it. There's no allegations either. Well, Your Honor, what I would say is that the allegations are in the Rule 32 petition, and that's what we're limited to at this point. We're not allowed to supplement allegations at this stage of the federal court. Well, the Rule 32 petition amended is very fact-specific... It is, Your Honor. ...on many, many things, and we have to take all those allegations as true. So it's even better than proof because this is such a... I think it's like an 80-page Rule 32 amended. That's absolutely correct, Your Honor. Okay. As to the neuropsychologist, what I would say is that was not something that was engaged at the time of the penalty phase here. Counsel was sufficient... No, no. This is post-conviction. You're absolutely right. It's post-conviction, but you have to show on post-conviction what the jury would have heard that they never heard, or at least allege it. And there's no allegation about it, as I understand the record, even though post-conviction counsel hired, through the court fund, a neuropsychologist. Well, what the allegation is, and this is in 150 of the petition, Your Honor, is that it refers to these head injuries, the 20-foot fall and the baseball bat. And it says, although documentary and other evidence in the form of hospital records and oral testimonies from Ms. Maples and friends who were with him during these incidents was available, counsel did not use this information in any way. That's his trial counsel. If the jurors had been aware of these traumas, or if the psychologist had adequately explained the impact of these traumas upon Mr. Maples' behavior and mental state, there's a reasonable probability that Mr. Maples would not have been sentenced to death. Now, that doesn't go all the way of the neuropsychologist and the like, but that allegation has to be accepted as true, along with everything else in the petition. And if the state wants to push back on that, that's the kind of thing they can do in an evidentiary hearing. I mean, one of the most remarkable things about this case, with these allegations, is that Mr. Maples was never afforded an evidentiary hearing, despite as many requests, not in the state court, not in the federal court. The type of hearing where these allegations are explored... Okay, I don't think there was a COA on the failure to grant an evidentiary hearing. Am I correct about that? There's been no COA granted in this case. Your Honor, you're not. I mean, you are correct. There was no specific on that issue. What I would say is pointing you to your decision. And I think part of it is because your allegations in the amended Rule 32 are very detailed and very specific. Yes. And in fact, we have to take them as true, whether they're right or not. I don't know whether he had head trauma or not. That's absolutely true, Your Honor. And the last thing I would say on the head trauma is, compared to the head injuries in Sears, these injuries are actually very significant. And this is only one piece of the puzzle. Now, the district court and the state court, the central error that they committed, and this court has recognized in the Daniel case, the Supreme Court has recognized it in Williams v. Taylor and Wiggins v. Smith and the Rampilla case, is it just took each piece of mitigating evidence and said, well, these additional allegations of abuse, they're not enough to undermine confidence in the outcome. So we're going to dismiss those. It said that on page 118, the district court of her opinion. And then it took the head injuries. Well, these aren't enough either. We're going to dismiss that. And then it took the suicides. This isn't enough either. Page 147 and 141. This isn't enough either. We're going to dismiss that. It never did what the Supreme Court says you have to do, which is consider the totality of this evidence together and weigh it against this. Who is it? Both the district court below, the federal district court and the state court, Your Honor. They never engaged in the re-weighing that this court's and the Supreme Court's precedents require. Mr. Garre, how would you get an evidentiary hearing in the absence of a certificate of appeal ability on that issue? Well, I think, Your Honor, this court's decision in Daniel v. Commissioner would be the guide where this court recognized that on the allegations that had been presented and accepted as true, they must be under this court's precedent. The petitioner would be entitled to relief and therefore would be entitled to an evidentiary hearing. Now, in this case, we think we're at least if this court agrees that that we've established prejudice on the basis of the allegations as accepted as true, then we're at least entitled to an evidentiary hearing under Daniel. But actually, we think that we would be entitled to relief because the state, and we can hear from the state, has never really disputed factually each of the allegations. It's really just argued that they're not enough. They're cumulative, as they say, as to some things or that there's other evidence that the jury agreed. So I'm not even sure if we need to have an evidentiary hearing to resolve this case and but at the minimum, we are entitled to an evidentiary hearing until he's and he cannot be sentenced to death with that one. Now, the another thing that's... Excuse me, let me ask you another question. The district court rejected some of the allegations of mitigating evidence by saying that the evidence, if introduced, would have prompted the state to respond with additional evidence and aggravation. At the pleading stage, can the court consider what the state might offer in response? Would you, can you help me with that? I don't think so. I mean, I think that that's an argument as to strategy and it goes to one piece of mitigating evidence, which was the efforts of cooperation with law enforcement. And on that, the sentencing court itself faulted Mr. Maples for not coming forward with the testimony of a police officer or the police report describing Mr. Maples' assistance. And that itself is prejudicial, that counsel's failure to put on the police officer, Lieutenant Green, as alleged in the petition. And that itself is prejudicial. But one of the arguments that the state has is that there were actually strategic reasons for not putting him on. But this court and the Supreme Court has recognized that counsel can't make a strategic decision without basing that on an adequate investigation. And here, the record as comes before the court, Mr. Maples' attorneys never reached out to anyone at the police department, including the men. I'm asking a slightly different question, which is about the procedure. Is it proper for the district court to consider something outside the pleadings like that? No, Your Honor. Is there any authority that supports that? Well, what I would point you is to your decision in the Daniel case where you recognize in considering a prejudiced argument in the same context, you would accept the allegations as true. Now, I think the state can argue as a general matter that there were strategic decisions here, and we can debate about that. But I think the court has to accept the allegations as true. And I don't think the record in this case can be defended based on a strategic decision because you can't make a strategic decision without conducting any adequate investigation. The Supreme Court has made that clear many times. I'm looking from the district court's order with regard to Wong v. Bellamonte's 2009. I'm sure you're familiar with that case. Your Honor, I'm not on the top of my head. That's the one where they really firmly established that you've got to consider all the new evidence with the old evidence and put everything together, both mitigating and aggravating and rebalance everything. Right. That's the right way. But it says there, and I'm looking how the district court actually cited that and said, the question is whether the senator would have concluded that the balance of aggravating and mitigating did not warrant death. You said that district court never did that balancing, but on page 101, she's... No, she didn't, Your Honor. There's nowhere in her opinion can you see a consideration of the totality of the mitigation evidence that could have been presented weighed against the sole aggravating factor that the state relied upon. You're saying she just sets forth the correct standard, but never applies it. That's right. Again, the way to understand that is if you look at pages 118, 141... She has a cumulative error section at the very end. She does take it step by step. I agree with you. But then she says, even if you consider all of this cumulatively, you have an established precedent. And that part of her decision is not the re-weighing required by the Supreme Court. It's a cumulative error that the number of errors... It's all in the section on the balance of aggravating and mitigating. Anyway, I'm not going to argue the point with you, but let me ask you something about what Bill Wong says. It says you also consider all of the evidence the prosecution surely would have presented in response to the mitigation evidence. That doesn't sound like to me the prosecution has to come forward with the evidence. It sounds like to me that they can allege we would show this, and you have to consider all the evidence the prosecution surely would have presented. Is that correct? If you had opened the door, say, to the drug help on the drug case. Your Honor, if that's correct as a general matter, it doesn't help the prosecution here. I mean, first of all, you'd have to look at the arguments they made in their brief, and I'm not sure they made this fulsome type of argument. The second, I think, more basic problem with them is if you go back to the sentencing phase of this case, as the state trial court recognized on page 5 of its sentencing order, which I believe is in Volume 7, the appendix before this court, the state relied upon only a single aggravating factor, the notion that the crime was committed in connection with a robbery instead of a theft. And then here's the quote, the state did not rely on any other aggravating circumstances as those circumstances are defined and construed. No, I don't think it would be as aggravating. I think it would be, you say, my mitigation evidence is so strong. He helped law enforcement. This is strong, new mitigation evidence. And then the state's going to come back and say, well, let's look at what the details of that were. He did it as out of revenge against Mr. Carroll, who had dated his girlfriend, who had been his long-term friend. And how did the state even know he was dealing in drugs? It is not to do a new aggravator. The state says they'll take every bit of your new mitigating evidence, and we will counter it with evidence that will show that it's not mitigating or it's very weak. That's the argument they make. And I don't think that argument withstands scrutiny, Your Honor. First of all, with respect to the evidence of abuse, I've already given you many examples of abuse that the jury never heard. Now, they claim it's cumulative. It's not cumulative. I think the jury heard he was beat all the time by the mother. She even bound him to the chair and hit him with a broom. They had multiple examples of abuse by the mother. I think that's incorrect, with respect, Your Honor. I mean, really, you've got to look at— I have the evidence outlined right here, and they had multiple examples of abuse by the mother. Yes, I agree. You've done some other examples, but they're all the same type of a physical, psychological, horrible abuse. These are very vague and conclusory allegations. And again, I would urge you to look at the specific pages of the transcript. It's not going to take long. It's only three pages. And in all of these cases, Williams versus— Oh, but you had Dr. Sheehy testify about it. You also had the father testify about it. Dr. Sheehy didn't have firsthand knowledge of it. He makes only vague and sort of a life history sense. The only witness that really had firsthand— I thought Dr. Sheehy said the mother beat him all the time. He made a vague reference to beatings, as did the father. And this is true in Williams versus Allen and Daniel versus Commissioner Johnson versus Secretary Ward. There was a witness put on who testified about abuse, but the additional evidence of specific incidences, description— I'm going to keep you full rebuttal, so I'm going to stop you at this time. Okay. Thank you, Your Honor. And it's fine. You'll still have your full seven minutes, even though you're two minutes over. Thank you. For the State. Thank you, Judge Hull. Andrew Brash for the State of Alabama. May it please the Court. So, as Judge Wilson said, I think the central issue in this case is the fact that the story that Maples told in his state post-conviction petition is not meaningfully different than the story that his lawyers told through witnesses at trial. And then the same judge that sentenced Mr. Maples to death denied his state post-conviction petition after reading these allegations. I do want to make a couple of points about— That order that the State judge entered, that was the order that was proposed by the State? That's correct, Your Honor. I thought it was verbatim. He just signed it, put a different date on it. Isn't that correct? That's correct. The order was proposed by the State before the amended petition, right? There was an amended petition. I believe that is correct, that the order was— And the order by the State, therefore, doesn't address some of the things in the amended petition. I don't think that's accurate, Judge Hull, because I think that the order ultimately addresses the key allegations of the amended petition. Why can't we say, then, that the State's decision was based on an unreasonable determination of the facts under AEDPA, so, therefore, it's not entitled to deference? Well, for a couple of reasons. The first is that there were no fact findings in the order. This is not a fact-finding issue because there was no hearing held. The second is, the way that this Court has addressed similar orders in the past is to say, look, we defer to summary— What do you mean there's no fact-finding? How do you decide the petition without determining facts? You accept the allegations as true. There are no findings of fact. There's no credibility determinations, et cetera. What this is basically is— But the order, that determination in the order was based on the original petition, which was later amended. Well, the judge did adopt the order that the State submitted, but the State could well have submitted simply an order that said, deny. The point being is that this is ultimately the same thing as a summary denial, which this Court would pull up a deference. Right. That doesn't give us a lot of confidence, though, that the judge took seriously the amended petition. Respectfully, Judge Wilson, I don't think that's the standard for applying it, but deference. You owe deference to the State court decision because it adjudicated these claims and merits, and there's no doubt that it adjudicated these claims and the merits. Once again, I think the right way to look at the State court's decision is if it were a summary denial. I do want to make some points about the psychologist because his testimony, I think, is the most important. Before we leave that topic, though, so you're saying even though the State habeas court had material inaccuracies about what Mr. Maples alleged, that we just can't review that? We just have to defer to that? I think that what you're deferring to is not to any specific phrase in the court's order. What you're deferring to is the judgment of the court that it denied the petition. So the right way, I think, to look at this is as if it were a summary denial of a petition, which this Court has said time and again that it defers to. You're deferring to the judgment of the State court and not to any specific thing. It's different when there's an evidentiary hearing and a judge weighs the evidence and makes specific fact findings. Then you're deferring to this specific fact finding, which are treated differently under AEDPA. We have here basically a summary denial, and that's what you have to defer to. Three points about the psychologist. The first is that this psychologist was incredibly well qualified. He was the lead witness for the defendants. He was a professor at a major research institution. He was the president of the State Association of Psychologists. He was on the board of examiners for the State deciding whether other psychologists actually got able to practice psychology. The second point, where I disagree with my friend on the other side, is that he expressly evaluated Mr. Maples for mitigating circumstances for the penalty phase of this case. I don't see anybody with our record excerpts in front of you, but we have the penalty phase in the record excerpts. I would strongly encourage you to look at that. It's tab B of our record excerpts. On page 3158, let me just read you what he said in response to a question. When I did an evaluation, I did an evaluation focused on trial competency, mostly at the time of the alleged offense, and with the understanding that I also needed to do a psychological evaluation to shed light on the possibility that this hearing would take place. That is, whether there were psychological factors that would have a mitigating effect. Then he's talking, he's criticizing the State's expert. He says, and Dr. Mayer didn't really address that issue in his report. When I say there is no difference between his report and the State's report, the only difference is that he essentially didn't evaluate Mr. Maples for the purpose. He wasn't asked to evaluate Mr. Maples for the purpose of whether or not there were mitigating effects. This psychologist did expressly evaluate him for mitigating factors. The third point is that this psychologist did present a fulsome picture of Mr. Maples' life, that he was abused by his birth mother before the age of three, that he was abandoned by her, that he was ultimately taken in and transferred custody to his father and to his stepmother, that he lived with them, and then he fell into drugs and alcohol in his teenage years. He presented that to the jury over the course of about two hours of testimony in front of the jury. The psychologist talked about that. He went into detail about the drug abuse, talking about times when Mr. Maples had spent years on the street because of his drug abuse. What about, I don't recall him saying anything about the slashing his wrist with a butcher knife in an effort to commit suicide, playing Russian roulette, took antidepressants in jail prior to trial, once took over 30 sleeping pills and drank a bottle of alcohol and crashed a family member's car. There's a lot of stuff that he didn't factor into his evaluation. Those specifics were not something that apparently Mr. Maples told him about. I think they would have come out had Mr. Maples told him. But those specifics, when they raise those claims in their state post-conviction petition, they're under the rubric of drug and alcohol abuse. Do we know, we don't know whether or not Mr. Maples told him about those things. Do we, just if we're limited to the allegations of the petition. That's right, and I don't think there's any allegation that he told them about those things. There might be, but it's a long petition, but I don't think there's an allegation that he specifically told the psychologist about those things. And that would be the only way, obviously, that anyone could know about those things. No, I think we have to take it that he didn't tell them about it because they say the trial counsel did not discover the three suicide attempts. Right. I think we have to take it that trial counsel didn't discover that information, that they didn't know about it, and Dr. Sheehy didn't know about it. Unless I look at the report. That's why I want to look at the report and see if there's anything in the report itself. Do you know if the report itself is in the record? I do not believe his report is in the record. Counsel had no... I'm not talking about in the Court of Appeals. I'm talking about the state court record. I don't believe defense counsel submitted his report for the record. Now, just to be clear... So the state's position is that we can assume that since he didn't discuss it, we can assume that Maples didn't tell them about it. Look, this is the position of the state, just to be clear. The question here is whether his counsel were deficient. His counsel hired an incredibly well-credentialed psychologist to do a full psychological exam on Mr. Maples. His counsel had that psychologist on the stand for an hour and a half, two hours, to give a full psychological profile of him. This didn't come up. I don't think you can criticize his counsel for hiring an incredibly well-credentialed psychologist who then does a full evaluation of Mr. Maples for presenting mitigating evidence at the sentencing phase. And to be clear, too, the district court discounted this evidence because their allegations about this evidence come under the rubric of drug abuse, about the difficulty of his mother. And all of that, all of that was well presented. His attempt at rehab, his difficulties living on the street because of drug abuse, that was presented to the jury. He didn't... He alleges in his petition that he didn't even begin preparing this expert to testify until after the guilt phase. In a case where there is a confession, and we've said in these types of cases before that, you know, if the penalty phase is the most important phase, you should start preparing for that before the trial. I mean, we said...  Johnson versus the secretary. No reasonable attorney who, due to a confession by his client, has every expectation that his client will be convicted and will be facing a death sentence, would wait until the guilt stage ended before beginning to prepare his mitigation presentation. That's exactly what counsel did in this case. And... Could I make two points, Judge Wilson? First, they can correct me if I'm wrong, but I think that those allegations are about the family members. I don't think they make a similar allegation with respect to the psychologist. I'm sure they'll correct me if I'm wrong. And two, I don't actually think the allegations in their state post-conviction petition were that allegation. I thought the allegation was that he spoke to Dr. Sheely, but he didn't prepare Dr. Sheely to testify until after the guilt phase. They can correct me if I'm wrong, but I don't recall that allegation. Of course, it is a long post-conviction. I know they made allegations about the family members. In their brief, they say that the family members weren't prepared to testify until after the guilt phase ended. In their state post-conviction petition, they don't actually make that allegation. They make a lot of that, trying to make a lot of that in their brief. But in their state post-conviction petition, and you can see what they cite to try to support that allegation on page 10 of their reply brief, that actually they just alleged that trial counsel prepared their witnesses after trial began. And this was a two-week trial. So it was a substantially different allegation to say that you prepared your witnesses to testify after trial began than to suggest that you waited until the guilt phase was over. If I could address the head injuries issue, which also came out when opposing counsel was up here. Let me just ask you one question before you get to that. He alleged in paragraph 131A that counsel had in their possession Mr. Maples' application to quest, that was the rehabilitation facility he was in, that chronicled his past drug use, his suicide attempts, and his desire to improve his life. But counsel inexplicably failed to submit the application into evidence, nor did they request. It seems to me that is an allegation that counsel was aware of information, had they properly investigated, that would have led to his suicide attempts. And indeed, even a particular document that would have chronicled some of that. Well, of course, Your Honor, the issue about him seeking rehab with quest was, in fact, presented to the jury. But I'm talking about the evidence about suicide attempts. And the point that I think the district court's point with respect to that is well taken is that all of these allegations about suicide attempts are really under the rubric of drug use. That's really the issue is drug use. And the psychologist went on for about an hour talking about the extensive drug use that Mr. Maples had here. But he didn't relate it to suicide or depression. That's right. I mean, there was no specific issue with respect to suicide. Now, the psychologist did diagnose him as depressed. So the psychologist, in fact, diagnosed him as depressed. With respect to the brain trauma or the head injuries, just four points with that. The district court said that there was no deficient performance there because there were no red flags in this case that one would look for brain trauma arising out of these head injuries. And that's entirely correct. Mr. Maples excelled academically. The psychologist gave him intellectual tests. He performed well on those tests. The second point is that the psychologist actually in his testimony, and this is at page 3148 of the record, expressly ruled out that he was brain damaged because he did so well on the test that the psychologist had given him. The third point is that in their rule 32, you should look at paragraph 150, which opposing counsel read from when he was up there. That's the only time where this allegation is made. The caption of that paragraph is counsel failed to investigate Mr. Maples physical trauma. That paragraph treats these head injuries as physical injuries, not as injuries that led to brain damage or anything like that. What did the state trial court say about his suicide allegations? I don't think the state court said anything about the suicide allegations at all. That's right. I mean, once again, I think that the right way to read the state court's decision is as a summary denial of the petition in the case. What's your authority that tells us we should do that, that we should read it as a summary denial? Well, the Harrington v. Richter, for example, I think says, I mean, it doesn't say specifically that, Your Honor, but it does. Well, that's where there actually is a summary denial. Yeah, but the point of Harrington v. Richter is that what this court is doing when it's deferring under AEDPA to a state court decision is you're deferring to the judgment of the court. You're not deferring to the language the court used or the way it described the decision. The Supreme Court's decision in Johnson was very similar there. The court said, actually, it's kind of directly on point to Judge Wilson's question. The court said that just because a court doesn't address a specific claim, in that case, it was the California Supreme Court. But here, it's worse than the state court doesn't address a claim. The state court affirmatively said he did not allege, he did not name witnesses, and in fact, he did. I counted at least nine instances where the Supreme Court just, I mean, sorry, the state habeas court was just wrong about what he alleged. Well, just to be clear, once again, I think that the right way to read it is as a summary denial. We're not looking to see whether the state court was, we're looking to see whether the state court was objectively unreasonable in denying these claims. We're not looking to sort of nitpick the state court's analysis of this petition. But the state court was wrong. It didn't acknowledge his suicide allegations, and then it found that he offered no specific details in paragraph 130. That's wrong, isn't it? In fact, the district court pointed this out on page 140 and 141 of its opinion. Well, once again, Judge Wilson, the Supreme Court has said, even if a state court doesn't address a claim, you still defer to the state court's rejection of that claim. That's the Johnson case from the Supreme Court. So the fact that the state court didn't address a claim, it just, it's not dispositive of the question. It didn't acknowledge it. It didn't acknowledge it, but it found that he offered no specific details about the suicide allegation. Well, just to be, once again. That's an incorrect fact, isn't it? Well, that's not a fact finding. I mean, the district court, I mean, the state court was not involved in a fact finding process. It's an incorrect determination. Well, it's something that the district court said that you're reading, I guess, that the petition is different from the, I'm sorry, for the state courts, yours is different. It's not an unreasonable determination of the fact? No, it's not a fact finding at all. The state court didn't engage in a fact finding process here. But the state court has to assume the allegations are true. That's correct. Isn't that tantamount to evidence or facts? I think under the rubric of AEDPA, it's not. I think what we're engaged in here is evaluating whether the state court was objectively unreasonable in denying this claim as a question of law, given the allegations in the petition. There were no fact findings in the state court's decision. And the last point I wanted to just make about the head trauma issue was a point that came up. What I thought was interesting about this case, because of the procedural posture, is that actually you don't have a final decision because it never got appealed timely to the Alabama Supreme Court. And I thought you were going to say that's another reason why we have to use a summary denial here because they defaulted that. The Supreme Court says it's not procedurally defaulted. There was cause. The lawyer abandoned him. So we're in a very unusual posture here where we actually don't have a state court review of anything to have a final decision of the highest court because there was a failure to appeal it. But the Supreme Court said there was cause to failure to appeal it. So what are we reviewing here? Even I don't know whether we give deference or not. I don't even know whether we review the state court, circuit court finding opinion at all. Because it was never appealed and there was a cause for not appealing it. So what are we reviewing here? I mean, ultimately, I think you're reviewing the judgment of the state court that denied these claims. Of course, the reason these . . . And we've got to substitute like there should have been an appeal but for the abandonment and we assume it would have affirmed. I don't know. It's just in a quirky procedural posture. We've looked for a case. There's no case like this. It certainly isn't a quirky procedure. Are we reviewing . . . will the state court determine that the claim was procedurally defaulted, right? Well, the appellate courts did because there was a lack of an appeal. Right, right. State appellate courts didn't. The federal court did. Well, the appellate courts after they came in and tried to file a belated notice of appeal did reject that appeal on the grounds that there was a procedural default for the failure to timely appeal in the same way this court would reject an untimely appellate filing. I do want to . . . The Supreme Court sent this case back for these courts, these lower courts to determine whether or not there is prejudice to support the lack of procedural default, right? That's right. Whether there's prejudice to evade the procedural default. And so, I do want to address another case. It was raised in their reply brief and we didn't have an opportunity to respond and it was raised again. Before you do that, the prejudice to excuse the procedural default, do you agree that's basically the same thing as Strickland prejudice? Look, we concede that those are interrelated. We think that the actual prejudice to evade the procedural default is a higher bar because you have to meet that before you evaluate the merits of the claim. But they did not address this in their initial brief. They addressed it in their reply brief. They cited two cases from this court that suggest the opposite. Obviously, you'd be bound by those cases, but we would stand on . . . They suggest that it's the same thing. That's correct. Right. And that's our precedent. We would suggest that precedent is wrong, but we recognize obviously that you've read the cases that way. With respect to the Daniel case where Judge Pryor and Judge Wilson were both on that panel, I think it's actually good to talk about that case to compare the strong and effective dissidence of counsel claim in that case to the one in this case. Could I make three points about Daniel? The first is that in Daniel, this court said that the lawyer there was alleged to have never even met with the family, to have never met with his counsel, to his client to talk about issues of his family history or his mental health. And that was the deficient performance there. Here, there are allegations in the state post-conviction petition that counsel met with his client's family at length to discuss these issues. And of course, they put family members and a psychologist on to talk about those issues. The second point, in Daniel, the only witness that counsel put on at all was a mother who testified just for a few pages of the transcript. Here, once again, you should read the whole penalty phase proceeding. It's in tab B of the state's supplemental appendix. You had a psychologist who testified for an hour and a half. You had three family members. And you also had two, you had an employer and another family member who testified as character witnesses in the guilt phase. This is a much more robust presentation. And the third, and I think the most important difference between this case and the Daniel case, and the one that really highlights why these claims are so much weaker here, is that in Daniel, there were allegations of sexual abuse that counsel never discovered and put before the jury. That's not the case here. There were allegations in Daniel that Daniel was removed from his family and put in foster care. That's not the case here. The jury knew that he left his abusive birth mother and went to live with his father and stepmother. You would agree, though, that the fact that counsel put on some mitigation evidence doesn't mean there can't be prejudice here. Absolutely. Or deficient performance. Right. The point that we're making is that the question this court has to look at, under this court's precedent, is to say what counsel did and then say what new things they've suggested counsel should have done and see whether there was a substantial difference. I mean, this is what the Supreme Court said in Sears, the case that they cite extensively in their briefs. The Supreme Court said, quote, there is no prejudice when the new mitigating evidence would barely have altered the sentencing profile presented to the decision maker, end quote. And that's what we suggest happened here. The Supreme Court reversed the Ninth Circuit in Cullen versus Penholster for doing effectively the same thing that I think my friend on the other side of this case is suggesting that you should do. They reversed them for saying that even though there was a testimony of a mother who testified about some mitigating circumstances and the defendant came in and said you should have put on a psychologist, you should have put on some records, you should have done all these things to substantiate the mother's testimony and flesh out the mother's testimony and, in my friend's word, give detail to the mother's testimony. The Supreme Court reversed the Ninth Circuit for undoing that death sentence there and said that testimony and evidence that merely substantiates what counsel actually did is not sufficient for prejudice. I think... I'd cut you off. You were getting ready to say about the new arguments they make in their reply brief. I think that's where you were going. That's right. And I just want to make just a very narrow point, which is that in their reply brief at page 10, they tried to cite some parts of the post-conviction petition to say that they had made these allegations about the family members not being adequately prepared. We believe that's incorrect. And if you look at those, the difference is that the allegation that they make there is that these witnesses weren't prepared until trial began, as opposed to waiting until the end of the guilt phase. That's very different. The Daniels case, also, I think it's incredibly different here because their... In the opinion itself, it says one of the important things about this case is that there were allegations of intellectual disability. So you had sexual abuse, foster care, intellectual disability. That's another issue, very different from this case. And I do want to address one point that opposing counsel made about there being a lack of detail in the father's testimony about the abuse. The psychologist testified generally about an abusive relationship, recounted some examples, but these are some examples the father testified to, that the birth mother beat him on several occasions, that she choked him, that she left him in the car with the windows rolled up, that she slapped him. And then the father went on and said, look, there was this one incident where she tied him to a chair with ropes. I came home from work one day and my little toddler had rope burns on his arms. The father also testified about the birth mother and said she tried to kill me on several occasions. She poured hot grease on me. She tried to shoot at me. She tried to stab me. So the jury here had a fulsome picture of the abuse that this birth mother did to Mr. Maples, and it's just nothing like the kinds of things that this court pointed to in Daniels and said, you know, are similar cases where you have maybe some inkling of what happened, but not a full picture. Here, the jury had the full picture. And the jury ultimately— Did the jury hear anything about his return to his mother when he was 17 and her subsequent rejection of him? Yes, the jury did. We addressed the citations for that are in our brief. The psychologist talks about that when he's recounting his family history. But what specifically did the jury hear about that? Well, without quoting you specifically what they heard, I mean, they heard that against his father and stepmother's wishes, he went to live with his birth mother at about the age of 17 for a short period of time, that he came back from that experience—his stepmother testified that during that time period, he wasn't even really with her. He was really on the street. And then when he came back from that experience, that's when the hard drug use started. And that's really when things spiraled downhill. So the jury did, in fact, hear about that incident. And look, what this court has said time and again is if you have 20-some-odd years to relitigate a penalty phase, you can obviously come up with new witnesses. You can obviously come up with new incidents. But the question for ineffective assistance, the question for prejudice is whether there's something substantial that counsel failed to introduce in front of the jury and whether that would have ultimately changed the result. And what happened here is the jury and the trial judge, they knew about these mitigating circumstances. The trial judge specifically found that these mitigating circumstances existed. What's troubling about the 20 years of litigation in this case is this case has been to every level of the federal and state judiciary, all the way up to the Supreme Court and back. And he's never had an evidentiary hearing on his allegations. That's troubling to me. Well, with respect, Judge Wilson, as this court said, and Daniel, the only way you get to an evidentiary hearing in light of just the way AEDPA works is you have to say that the state court was objectively unreasonable to deny on these allegations. And then, look, opposing counsel mentioned this. If this court were to say that the state court were objectively unreasonable in light of these allegations, then he would have an opportunity to try to prove up these allegations in an evidentiary hearing. But the way the system works is that first he has to show that the state courts were objectively unreasonable with the merits determination that they made. And just to go to the aggravating and mitigating circumstances here, the issue was not that his counsel did not put forth evidence of mitigating circumstances at the penalty phase. The issue was not for the trial judge who sentenced him or the jury that there were no mitigating evidence. The issue is that they weighed the aggravating circumstance to outweigh the mitigating circumstance. And at the end of the day, Mr. Maples committed a double murder, cold blooded. One of the victims was his friend. Another was someone that he barely knew. He stole their car and other items. He traded the items for drugs. He drove around sort of showing the car off. He left from the murder scene to go to his old girlfriend's house, still bloody from his victim's blood, and tried to get her to do drugs with him. This is a case where the trial judge and the jury was well within reason to say that this aggravating circumstance outweighs the mitigating circumstances. And at the end of the day, all my friend on the other side of this case has put before the court are just mitigating circumstances that are very similar, if not exactly the same, as the ones that the trial court and the jury saw. Unless the court has any other further questions, we simply ask that you affirm what the district court did. Mr. Garra. Thank you, Your Honors. First of all, the state court order was absolutely prepared before the amended petition and so doesn't address many of the additional allegations. That in itself is a sufficient basis to provide it's an unreasonable application. Well, Mr. Bratcher says there are no fact findings in the state court order. What's your response to that? Well, it has to be accepted as true. There was no evidentiary hearing. The allegations in the petition, as this court recognized under Alabama law and in the Daniel case, have to be accepted as true. So it's even better than fact finding. They have to be accepted as true. And now with respect to Dr. Shealy. What I was trying to say is better than evidence you're hearing. I don't know if you can prove all this, but you get it as true. And we have to evaluate it. So we take everything you alleged in the amended petition. Help me with this. I know you say there's more abuse about the mother. Let's put that aside. More instances that would have been more gripping, compelling. I want to make sure I understand what's really totally new that the jury never heard. Anything about. Let me tell you what my understanding is and tell me if I'm missing something. We got the two head trauma. They didn't hear anything about the fall off the cliff or the baseball bat hit. Correct. Okay. And the cliff was as a teenager and the baseball bat was about a year before the murder. All right. They didn't hear anything about suicides. I've got to check that. But I think that's what you're telling me. That's absolutely true. All right. So they had the three suicide. These are alleged in the complaint. The 30 pills, the Russian roulette gun to the mouth. I've been through that complaint a lot. Amended complaint. So that's totally new. Okay. I don't think Mr. Birdsong, the employer's totally new because he did say he worked for me. He was testified in the guilt phase. Birdsong's not totally new. So help me with what I know. One of your major points is that the other part, the mother neglect, the mother abandonment was covered, but nowhere near what? Yes. Adequately. I know that's a huge part of your case, but let's put that aside. The head trauma and the suicides. What else is totally new? No word was, not a word was ever said about it before the jury. The jury didn't hear that his mother tried to sell him when he was three years old. The jury didn't hear. Okay. All right. Let's say things mothers did. I'm trying to put that aside. Okay. Well, there was additional evidence. They never heard from the jailer about his post-arrest good behavior. Your Honor, they didn't hear. I thought the jailer did testify. The doctor, I thought Dr. Sheehy said the jailer said he'd been good in jail. Now, this is at page 140, paragraph 147 of the complaint. Mr. Frost, the jailer never testified along with substantial additional post-arrest behavior. I thought Dr. Sheehy said he'd interviewed the jailer and he said he was a very good. They never heard from the witness directly. I know they never heard from. I'm just saying that, Your Honor. Okay. All right. I'm talking about something totally new. The jury knew that he was cooperative in jail and had not been a problem in jail. They knew that. I realize Mr. Frost could have put— And so I think Your Honor has identified the key things that are new. Okay. Unless you want me to go point to the new allegations of abuse. I know there's lots of things that you say were covered but not adequately. No, but I think that glosses over a critical point, Your Honor. Well, let's say they were covered cursory and so they were worth nothing. They should have been more developed. But I want a totally new. So the head trauma, the suicide, and Mr. Frost. And an additional point that I would make, which is critical, is they never heard about how that abuse that happened when he was three years old impacted him into his teens. For example, they never heard about the fact that he was having nightmares as a teen and woke up crying for his mother. That's at paragraph 122. And that's critical because it ties into the evidence of the suicide that they never heard about. They were given the false impression that he basically was abused as a three-year-old and then had an okay life, which is exactly what Kenneth Maples said in his testimony at page 3190. He had an okay life growing up, which couldn't have been further from the truth. So it's worse than just not having been told the entire story. They were told a false story. They also were told by Dr. Sheely that Mr. Maples suffered from, quote, mild depression. That's what Dr. Sheely said at page 3148 of the transcript. Well, that mild depression doesn't describe someone who tried to slash his wrist with a butcher knife, took 30 pills, or tried to kill himself by playing Russian roulette. They never heard about that. Now, Dr. Sheely, just to respond to a few of my friend's comments, wasn't prepared. This is set forth in paragraph 115 of the amended petition where it says, counsel did not prepare any of these witnesses, including Dr. Sheely. They didn't prepare, they didn't even tell the witnesses they were going to testify until a break before the penalty phase. That's in paragraph 115.2. Now, the fact that they presented a psychologist certainly was better than not presenting one, but that was true in Williams v. Allen, too, where the case did present a psychologist, but yet this court recognized it was a woefully deficient representation. Now, trying to equate drug use with suicide really doesn't withstand the straight face test. Suicide is completely different in kind and degree and tells a completely different story about Mr. Maples' life history that the jury never heard at all. Now, the fact that there is a single aggravating factor in this case is significant. The court pointed to that in the Williams v. Allen case, and it wasn't just the fact that there was only one aggravating factor. You had the additional fact that the state conceded that Mr. Maples had no history of prior violence. That was page 7 of the section on murder. But were there two murders in the Allen case or a single murder? I forget the precise murder. The fact that there are two murders is an aggravating circumstance and wouldn't in itself have been sufficient under Alabama law to put Mr. Maples to the death penalty at the time that he was sentenced. Now, of course, any capital, any case in which someone is convicted of a capital murder is unpleasant and has terrible allegations. But the fact that you have only a single aggravating factor under Alabama law is significant in conducting the re-weighing that the district court never did and the state court never did of the totality of the case that could have been presented to the jury. So what's the rule in Alabama now? It was a 10-2 vote? Yes, Your Honor. And so he only needed to convince, what, one other juror? One other juror, and they could not have recommended death. They would have had to go back to deliberate. But does this court recognize the Daniel case? He would have had to have five more vote for life to get life. He would have had to have five, seven have to vote for life. But we don't know how those jurors would have recommended if they'd heard everything. I'm just trying to answer the question. That's true, Your Honor. But I think— To get life, he would have had to have five more vote for life. But the jury could not have recommended death if just one other jury had come forward. And that's what this court said in the Daniel case. And that's the right way to look at it. But— and I think— I thought you said they would have to go back and be— they would have been told to— They would. They couldn't— if three jurors had recommended life, Your Honor, the jury could not have recommended death. That's, as this court recognized, in the Daniel case. The representation that Mr. Maples received at the sentencing phase of his trial was appalling. By any measure of justice, at the time of these events or thereafter, Mr. Maples has put forward specific allegations of additional evidence the jury never heard and pointed out the many false impressions the jury was given. That evidence, at the very least, is sufficient to undermine confidence in the result that the jury reached, therefore establishing prejudice. We would ask this court to reverse. Thank you, Mr. Garn. Before we recess, I want to acknowledge and thank you for taking this case. Your court appointed and the court could not do its work without your help. So we thank you for serving in this case. And we thank the state for its representation as well. The court will be in recess.